Okay, the next argued case is number 16-22-23, Trading Technologies International against the Rosenthal Collins Group, LLC. Mr. Siegmund. Good morning, Your Honors, and may it please the Court. This case presents a unique set of circumstances that test the very limits of when a district court should properly stay a case pending CBM review. It appears that Section 18 of the case law heavily favors a stay, but in this case, the facts and the different result. This is a six-year-old case. This isn't the first time there's been a stay for CBMs. This is actually the second stay for different CBMs. Trade Station refused to join or be a stop by the first round of CBMs, and this was a calculated decision by Trade Station and Interactive Brokers in order to avoid a stop while enjoying the benefits of a stay. I apologize. Sometimes I say Trade Station, and the two appellees here are Trade Station and Interactive Brokers, and I meant to say both of them. Appellees never gave the district court a good reason why they didn't file their own CBMs sooner or join in the early CBMs. By the time they filed CBMs, the TD Ameritrade, the first round of file CBMs that they finally filed the CBMs. So is your position that they were obligated to file? They say they didn't want to be bound by any estoppel, and they mentioned the cost, and it seems that in accordance with the rules, that in effect, they had the right not to join, or do you think that that's an incorrect statutory interpretation and that all defendants need to permit them to do what they did? But I think that, you know, we're in this world right now where everyone thinks stays should be almost automatic when a CBM is pending. I think the difference here is, and the problem here is, that when you sit back and watch a CBM occur, and you have the ability to join in it, or to file your own CBMs, it's unfair under the third factor, the third prong of the four-part test, to sit back, watch it all occur, and then jump in your own CBMs and say, well, now we want to stay again. So I think that what it affects is, well, to answer your question, well, what they did may be allowed under the rules. The fact that Congress gave us statutorily a four-part test, I think, would mitigate, you know, harassment and bad things from happening to patent owners. I mean, as far as we can tell from the record, the district took considerable consideration to these arguments of gamesmanship, or just unfairness, and so on, and did hesitate, and then finally decide that in this case, because of the complexity and the number of patents and claims, and all of the issues, that on balance, a stay would overall serve the major interests. And the question here is, we have a discretionary decision. Should that not have been permitted? Your Honor, I think that the judge, I mean, you know, I acknowledge in the briefing there's a big question of what's the standard of review. I mean, the statute calls for de novo review. Well, let's say we're trying to get it right. We still have a discretionary decision in which it looks as if the district judge did hear, and carefully consider, and balance the equities in the extraordinary complexities of this case. Your Honor, I would say that the judge just plain got it wrong. And I think there's an element here of the judge, and I frankly think this is throughout the land right now, the judges think they kind of have to stay. When you look at the precedent, when you look at the cases that have come up to this court, I want to say that there's one unpublished opinion where a stay was affirmed, but mostly the stays have been reversed. And it's interesting, after she entered the stay, we asked for rehearing on some issues. We said, you know, let us at least finish the few depositions that have already been scheduled. And thankfully, she let us do that. But during that A29303, she says, and she's one of these patent pilot program judges, Judge Virginia Kendall, she said, it's enough to make me not want to be, this case alone is enough to make me not want to be a patent pilot program judge, because it doesn't move. It's strategically stopped constantly, and it's frustrating. I agree that the case, the chances of the case going away completely are not realistic, and so I'm going to grant in part the motion to reconsider. I think judges, um, there hasn't been a case that I know of where a court, where this court has said, hey, you know what, you shouldn't have stayed. And I think this is the case. I think when you look at the third factor, there's compelling reasons why this case should be reversed, under any standard, under the abusive discretion standard, or under de novo, or under de novo review. Again, this I understood you in your brief to sort of trying to be challenged her judgment about what, how she thinks her court would be benefited from the stay. Your Honor, I do think that the third factor is not the only one that she. Well, that's what I'm trying to get at. I mean, a little bit from what the presiding judge was talking about in terms of what, how this judge has looked at the case. This judge said, boy, I recognize this is a very old case. It's been around so long, my son liked that. I don't blame her. But it would seem to me that the person who's in the best position to judge whether or not efficiencies would occur, this is basically what the second factor would force, is the district judge, not you. Isn't the district judge in the best position to make those considerations? I think that the district judge is normally in the best position, but I think this judge failed to consider all the factors. I, you know, she stayed the first, the first set of, she stayed based on the first set of CVMs, and I think that she felt like, given the case law, she had to stay. I think this is a chance. Why is the fact that she had been an earlier stay for a different CVM for a different party, why is that relevant to the consideration of this case? I think it goes to the third factor very strongly. I think that kind of what I said when I opened that sitting back and kind of watching this all go along and not participating in the first CVM leads to the kind of unfair serial. Is there another party that actually went to the PTO and then settled out? Are they in pairing material with your adversary here? I'll be honest, Your Honor, I don't know what pairing material is, I apologize. They're not wholly owned by the same company. No, they're a separate company. They're very separate parties, have separate interests, right? Well, I don't know if they have separate interests. I mean, these patents have a long, have a long history. You know, our client is a company in the business competing with these defendants. Judge Lori has been on panels that have dealt with at least two of these patents before. In fact, this patent, some of these patents have come up to and been appealed to this court. That's the first day we talk about when they were allowed to move for summary judgment before anything happened in the case. And the considerations that you rely on, the third factor, in the judge's mind were offset by the fact that she didn't seek a preliminary injunction. Yeah, I understand. And I actually think that that was error for her to put so much reliance on us not seeking... Is she wrong to put the unwillingness to ask for a preliminary injunction in the equation? I think it can be considered, Your Honor, but I think given the fact... And if someone who's arguing, oh my goodness, I'm going to have goodwill, I'm going to have these terrible things, you know, will happen to me if this infringement continues, ordinarily you would think that they would seek preliminary injunctive relief to protect themselves from those harms. Yeah, I think that while it might be something to consider, I think that putting so much reliance on a preliminary injunction, when you look at the whole history of the case, I mean, if my client would have known back in 2010, almost seven years ago, when it brought these cases, that this case would linger this long, the decision might have been different. Some of the courts have looked at, and I think Judge Newman in her dissent in the cases escaping me, maybe virtual agility, said, you know, there's many different reasons why you would not pursue a preliminary injunction. And putting so much weight on that factor, I think led to the error here. I think that, you know, there's many, many reasons why a client wouldn't, I mean, two of these patents, the 304 and the 132, have been tried to jury successfully twice already. One of them has been up here in the Eastby trial, another one which the court found that the patents were patent eligible are due to be argued in this court. I assume that the, you know, the schedule will come out soon. But in any case, these are patent, these aren't just, you know, looking at this in isolation and saying, well, they didn't move for a preliminary injunction, I think really kind of goes too far. And again, this stay is the third step. My mother wasn't suggesting that I was looking at that in isolation. I said, it's in the equation. I don't doubt that it should be looked at, but I think the weight that she put on that was just, I'd say it was an abuse of discretion. I don't know. She mentioned a whole bunch of factors on each side. She mentioned delays on your part and delays on their part, put them all together. And it seemed to me, put great weight on the complexity of the number of patents and the number of claims and the advantages to the court, if nothing else, to have a determination by experts. Your Honor, I understand that. But again, I, and we've laid it out in our briefs. I think the way that she looked at the factors, you know, you don't know what a judge is thinking, but it just seems like the courts are predisposed to grant a stay. And I know that the court knows this, but if Congress wanted to grant an automatic stay, they could have, and they didn't. It wasn't automatic, but the legislative history is full of statements by Congress people, senators and representatives, that a stay would generally be the rule and presenting that as an advantage to the Congress and to the nation, that the court litigation would be stayed while the experts reach a decision, which then results in an estoppel so that it wouldn't be in court at all. So that the weight, I think, has to be agreed to be in favor of a stay unless the other circumstances weigh against. Here, the pendency, the length of the proceedings do indeed weigh against another stay, but here we have a well-regarded judge who was going to have to try over these issues and put it together and explained in a cogent way, it seemed to me, and what I'd like is for you to tell us why that shouldn't stand. Yeah, and I see them already in my rebuttal. Well, we'll save your rebuttal, but do explain this. Your Honor, I think that the way the judge analyzed the factors just was error. I mean, for two, I don't think Congress intended to allow a party, say there were a string of defendants, can each of them wait? I mean, if there's five defendants, can the first one take a stay and that doesn't work, then the next one and the next one. That's why Congress gave us... Well, it isn't that bad here. Only the next one. Sorry, Your Honor, I apologize. We're on the third stay, and the other factor that I don't think the judge put enough weight in is in the CQG case, which is two of the patents in suit here, the district court found the patents, found the 132 and 304 patents patent eligible, and that case is coming to this court soon. And, you know, out of the nine patents that have been instituted for CBMs, five are on questions of 101, all right? Only questions of 101 at the CBMs. The CBMs will only be 101. So the fact that this court is about to rule on 101 for two of the patents, I think should have been considered much more strongly, and I... Yeah, let's hear from the other side. We'll save you rebuttal time. Your Honor, David Healy. I represent Trade Station, and today I'll be speaking for both of the patents. The first thing that is noteworthy is there's no dispute as to the law. The law is in 18b2 and 18b1. There's no dispute that the judge followed the factors in 18b1. There's no dispute that she did what the law told her to do, which was to take the record as before her, her familiarity with the case, her familiarity with the parties, and work through carefully each of these four factors. And she came to a decision, a decision that comports with what this court wrote, albeit in dicta in intellectual ventures, that it would be the rare exception where there wouldn't be a study. And what this judge also found, dealing explicitly with some of these allegations of gamesmanship and delay, at page 11 of her opinion, she found explicitly that given the explanations that the motive, that she would not give credit for gamesmanship to the other side. She also found on page 13 of her opinion, quote, while it is true that the nature of this litigation has been stop and go, both parties have been responsible for the near constant delays. And indeed, the first stay that my colleague refers to was his client's stay. We had frankly thought we won the on the most critical patents when we got a summary judgment granted. They appealed by engineering a rule 54B, partial final judgment. Then they took that up. The judge asked for a case management plan. That case management plan included their request to stay certain patents in addition to those that were on appeal and to go forward with the others. And their case management plan would not have contemplated full-bore litigation. It would have contemplated about half the case being stayed in any event. And I believe that that can be found in the appendix, if I'm not mistaken, about 23-644. The bottom line here, though, is if you go through the 13 and a half page opinion that Judge Kendall did, there is no issue of law. And so it becomes one of her exercising her discretion. She'd lived with this case and these parties for multiple years. This was, at one point, a case that involved 10 defending groups, that is, co-owned or mutually owned groups that would have been made up of multiple defendants and 19 patents. At the time of this stay, it was two defending groups and 12 patents. And pending were a motion by Trading Technologies to add five more patents against my client. That is, increase the number of patents from 10 to 15, the number of asserted claims from about 240 by several dozen. And there was a motion to add another patent against Interactive Brokers and increase the claims, which at that time were already 300, up even further. There was a motion to amend to add parties pending. And of course, there were discovery disputes. Mr. Healy, you gave us a supplemental filing, which I think was proper to tell us that EDO has granted three more patents. Yes, sir. How do we play that into the equation? Judge Kendall only knew that six had been granted, six were pending. Yes, sir. So should we somehow put those other three in the equation? I think so, Your Honor, because each of the ones that had been instituted had been instituted on at least 101 grounds. And these patents all go to various aspects of a graphical user interface. And each of those three patents that have been instituted likewise have been instituted on at least 101 grounds. And so the similarity between the scope of the patents... I'm curious about the situation because the playing field has changed since the judge made a discretionary decision. The change, one would think, supports the discretion in the way she exercised it. It does, Your Honor. But I don't know whether it's right for us to put that into the record, having happened after the moment in time that she made her judgment. I think this court has but not get into the initiation decisions. And, of course, we shouldn't get into the initiation decisions anyway. Well, just to pursue it, because to me it's a more interesting issue than some of the other. Well, what would happen if the PDO had turned down three? Well, then I think that would... Then you'd be arguing I shouldn't take that into consideration, right? I guess so, but the point is things are playing out exactly the way potentially adverse to your position. What's that? That would be potentially adverse to your position. It would, but what has happened at the PTO has played into our position. It's sauce for the goose. It's sauce for the gander. I mean, to come back to whether or not it's proper for us to give any consideration to the three grants. When we filed our motion, we told the judge that we believed all 12 would be initiated. And because of the similarities in the technology... Appreciate the fact that it was going to be initiated and how the judge would say, well, that's likely to happen. But what would happen if, for example, you had 12 and you're pitching your stay on three being granted and all nine got turned down? What I'm trying to get at is that I don't know whether I'm supposed to pay any attention to the supplemental authority that you gave me now that you've told me that if it had gone the other way, you wouldn't want me to be taking it into consideration. I think the reason why it gets limited consideration, that is just the fact they were initiated under Federal Rule of Evidence 201, is to show that her analysis has been supported by subsequent events. And the other thing... So that's comforting to her personally as she sits in her chambers. Perhaps. Perhaps it also lets her feel that if we're back in front of her status conference on October 13th, the things have worked out as anticipated. But your view is irrespective of the later events. Yes, irrespective of the later events, half the patents had been instituted by the time she granted the motion to stay the case. If that half of the patents, which is over 180 claims, in other words, more than half the claims, had all been or they all do get canceled in the process, she will have eliminated or allowed the PTAB to eliminate more than half of the claims in the case. And that will have been a simplification, a streamlining. It would have been a reduction of the burden and there was no undue tactical advantage here other than what is normally seen in a stay. But eliminated as to all of the defendants? Let's say all of the defendants hadn't brought the action before the PTAB, then it wouldn't have been eliminated as to any defendants that didn't participate, which is the way all of this started. Isn't that right? That's correct. But in this order, Judge Kendall explicitly took account of that and explicitly noted that both of the remaining defendants had joined in all of the petitions and so they would be binding on all of the remaining petitions. So this is something she actually considered explicitly in exercising her discretion. Which leaves open the question if it had been only one of the two, we leave that for another case? Obviously, because that's not this case. Okay. So, you know, in this case, which is the case we're dealing with, we do have this anomalous six-year delay. But as Judge Kendall wrote on page 13 of her opinion, she thought that was due to both sides' actions. I would submit that the first delay was the engineering of the Rule 54B final judgment and appeal by trading technologies as opposed to having one appeal at the end of the case. And in terms of the stage of the case, I think it's very interesting at the bottom of page 9 of her opinion, Judge Kendall goes to lengths to explain how TT is trying to expand the case, even at this stage. Increase the number of patents. Increase the number of claims. Increase the number of parties. And in doing so, in making these motions, they're arguing to her that the case is at an early stage. And she says, in her opinion, you can't have it both ways. You can't file motions with me to add 50% more patents against TradeStation, to add more parties to the lawsuit by saying you're in an early stage of a case when, in fact, now you want to say we're at the end of the case. The bottom line is Judge Kendall held them to their word on the stage of the case. And even if you look at their own briefing, I think they project that it would have been at least another two years. The other thing that I think is interesting is if you just look at the citations on the bottom of page 6 and the top of page 7 of our opposition brief, our red brief, and you look at the citations to the Sungard case, when it was filed and when it was resolved, and the citation to the CQG case, the original one, when it was filed and when it was resolved, those were 2005 cases. The Sungard case, I believe, was resolved in 2015 and the CQG case in 2016. There were no stays for CBM or otherwise in those cases, and yet they took 10 and 11 years before other judges to resolve. Here, we're not talking about the two patents only that they went to trial on in front of juries. We're talking about what are now 12 patents and three patent families. This is an enormously complex case. Judge Kendall used her discretion, and her opinion is remarkably thorough and frankly addresses, I think, pretty much every argument, if not every fact, that the Trading Technologies brief addresses in arguing for an abuse of discretion, and while they then argue for the de novo review, they give no explanation at all saying why there should be a de novo review. The statute says you can have de novo review for consistency in the law, but they give no explanation as to how she misapplied the law. She followed the law. And what the legislative history also shows is that de novo review would most likely come into place if you had developed a forum that simply refused to stay cases, and that became a magnet for patent owners' filings because they knew their case wouldn't be stayed. That would allow the Federal Circuit to correct that situation. The de novo review is really meant to keep to the word of Congress, which is that once a CBM review started, you would not have litigation going on in two forum, and that's what's going to happen if this stay, I mean, if this stay were lifted, the CBMs would continue to go forward. Would have no effect on the CBMs. There's a hearing in the PTAB on the CBMs within, on the first five CBMs within two weeks. They're not going to stop. And so the only point that would be made here is we would now have exactly what Congress did not want. What is the timing of the still pending CBMs? The first five are being handled on a consolidated basis, and they are having a hearing in the PTAB, I believe, October 15th. And then in the letter we sent, we have the rest of the timing, but we expect that all of the CBMs would be initiated, or the last of them would be initiated by December 9th of the 12th. So they're still in the initiation phase? They have, the five going to hearing have been initiated, briefed, they're now going to trial, I suppose, before three administrative law judges in the PTAB on October 15th. So the result Congress wants was to litigate these types of patents through a special transitional program that sunsets in the year 2020, and that is what Judge Kendall did. She gave effect to congressional intent in an enormously complex 12-patent case. Okay. Any other questions, Mr. Healy? Thank you, Mr. Healy. Thank you, Your Honor. Thank you for giving me some extra time. First, that first delay being our fault, you have to understand, they went to the judge and they said, we want a brief invalidity. This is before anything happened, before there was discovery. And they said to Judge Kendall, we want a brief invalidity on some of your patents. And they won. They invalidated some of our patents. We felt we had to bring it to this court. I don't think the record supports that we asked for a stay during any of that time. But, you know, not much happened in that case while the appeal was pending, and we won. It was reversed and we won. The other thing is, I didn't touch much on the simplification factor. I'll leave that. That's in our briefs. But, you know, two points. One is, you know, not all of it, they didn't, their CBMs don't have all the prior art. So even, you know, there's still going to be more prior art things to do when the case comes back to the district court. I suppose you could say if it comes back to the district court, but we say when it comes back to the district court. Well, if the CBMs decided it won't come back, will it on those patents? There's an estopolis between the parties. Yeah, but there's, Your Honor, there's more prior art. They didn't put all the prior art in the CBMs, and I understand there's various reasons for doing that. I'm not so sure that new issues can be raised. I think that's perhaps an unresolved question, but it doesn't make sense that Congress contemplated that you'd raise one piece of prior art in your CBM and maybe lose, and therefore go back and not be as stopped as to the challenge. Well, I hope you're right, Your Honor, but I'm actually not sure if that's the law at this point or not. No, neither am I. The other point I want to make is you asked where these CBMs are. You know, when they, this case came back down from appeal when we appealed the validity of the 411 and other CBMs and got a stay, and then when that stay was lifted, the defendants said, the two defendants who are still here among the others that were there then said, hey, let's keep the stay going. We're going to file our own CBMs, and the judge said, you know, I mean, she didn't immediately grant a stay. The case proceeded, and we actually made some progress, but what's interesting to note is they didn't file all their CBMs at once, even though some of them were very similar to the Ameritrade that filed. They spread out their filings over a year. I think it was from July of 2015 to June of 2016, so imagine if this isn't gamesmanship and tactics. I mean, that extra year probably, and I don't know what the position of the court would be if some of the CBMs were done and there were only a few tail end left, but, you know, that projects this delay out even further. Again, we are in our third stay. I just cannot believe that this is what Congress intended. I believe they put the four-factor test in as a safeguard, and I believe this case should be reversed, and I thank you for the extra time. Okay, thank you. Thank you both. The case is taken under submission, and that concludes the cases for this morning.